UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VENUS E. STANFILL, § <br> § <br> *Plaintiff*, § <br> § <br> v. § <br> § <br> CAROLYN W. COLVIN, Acting § <br> Commissioner of Social Security § <br> Administration, § <br> § <br> *Defendant*. § | CIVIL ACTION NO. 4:14-CV-603 |

## MEMORANDUM AND ORDER

Pending before the Court in this appeal from a denial of Social Security disability benefits and supplemental security income are Defendant's Motion for Summary Judgment (Doc. No. 10) and Plaintiff's Motion for Summary Judgment (Doc. No. 13).[1] Having considered the motions, all relevant filings, and the applicable law, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment.

### I.       CASE BACKGROUND

**A. Procedural Background**

Plaintiff Venus E. Stanfill filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("the Commissioner") regarding her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act").

---

[1] All docket references are to Civil Action No. 4:14-CV-603.

Ms. Stanfill filed an application for DIB and SSI on May 23, 2013, alleging disability since January 13, 2009. Her application was denied initially and on reconsideration. Ms. Stanfill requested a hearing before an Administrative Law Judge ("ALJ") on February 7, 2012 and a hearing was held on August 22, 2012. Ms. Stanfill was represented by counsel at the hearing. After the hearing, the ALJ found that Ms. Stanfill was not disabled. Ms. Stanfill requested review of this decision by the Appeals Council, but the Appeals Council denied her request. Ms. Stanfill then appealed to this Court.

### B. Factual Background

Ms. Stanfill was born on July 2, 1973 and was 39 years old at the time of the hearing. (Tr. 35.) She earned a GED and was most recently employed as a health safety administrator. (Tr. 184.) She has not worked since January 2009. (Tr. 183.)

At the hearing in August 2012, Ms. Stanfill, a medical expert, and a vocational expert testified before the ALJ. Ms. Stanfill testified that she was laid off from her previous job as a health safety administrator because she missed two and half to three months of work in a year due to her symptoms. (Tr. 39.) She also testified that she experienced dizziness, shortness of breath, and chest pain approximately 20 to 25 days in a month. (Tr. 43.) On those days, she stated that it is difficult for her to move or get up, and she cannot get dressed without her children's help. (Tr. 43-44, 50.)

At the outset of the hearing, the medical examiner ("ME") realized that he had not reviewed all of the medical records submitted on behalf of Ms. Stanfill. (Tr. 30.) Specifically, the ME had not reviewed Exhibits 15F and 16F: hospital records, dated 07/18/2008 to 07/17/2012, from Texas Health Presbyterian Denton and emergency department records, dated 11/05/2011 to

07/21/2012, from Texas Health Presbyterian Hospital, respectively. (Tr. 30, Doc. No. 5-15.)[2] As a result of this deficit, the ALJ stated,

> "if those records [that have been reviewed by the ME] are not sufficient to show that [Ms. Stanfill is] going to be found disabled, I do [sic] an interrogatory to the medical expert and ask the medical expert whether the new records change his opinion. If so, how and why."

(Tr. 31.) The ALJ then asked whether Ms. Stanfill had submitted a physical medical assessment from a treating source. (Tr. 45.) Ms. Stanfill's counsel stated that she had not, and that there were no medical records from her current treating physician, Dr. Joshi, in the record. (Tr. 45, 47.) The ALJ noted that Dr. Joshi was "a very important doctor as far as determining the outcome of this case," in part because he was a "highly credentialed specialist" who was currently treating Ms. Stanfill. (Tr. 55.) The ALJ repeatedly urged Ms. Stanfill and her counsel to submit Dr. Joshi's records and contact him for his opinion regarding Ms. Stanfill's physical capabilities, characterizing Dr. Joshi's opinion as "extremely strong evidence." (Tr. 53, 56, 58, 63, 79.) The ALJ also encouraged Ms. Stanfill and her counsel to propound assessment requests to Drs. Malik and Karim, but noted that these requests may go unanswered because Drs. Malik and Karim no longer treated Ms. Stanfill. (Tr. 71-72.) Finally, the ALJ told Ms. Stanfill and her counsel, "if [she] get[s] only the Joshi records without an assessment, I am almost certain to have to do an interrogatory to Dr. Murphy." (Tr. 79.)

Based on his review of Exhibits 1F-14F, the ME opined that Ms. Stanfill had the following objective medical impairments: status post pacemaker, cardiac arrhythmia disorder, and sick sinus disorder. (Tr. 59, 62.) The ME determined that the most analogous listing for Ms. Stanfill's condition was Listing 4.05, recurrent arrhythmia. (Tr. 64.) He stated that Ms. Stanfill did not meet or equal this listing, however, because there was no documented evidence of

---

[2] It appears that some of these records may be duplicated by Exhibits 2F and 10F.

syncope or near-syncope due to the arrhythmia. (Tr. 65.) The ME further noted that there was no documented evidence of recurrent arrhythmia, even though Ms. Stanfill complained of palpitations. (Tr. 65-66.) He stated that, when she went to the hospital, Ms. Stanfill's EKG showed a normal sinus rhythm; in only one instance did an EKG show evidence of "some PVCs [premature ventricular contractions]," which the ME characterized as a feeling that "the heart is thumping real hard and then stops, or it skips a beat, stops and then thumps real hard." (Tr. 64.) Finally, the ME highlighted that the record contains multiple instances where medical professionals have considered "non-physical sources" for Ms. Stanfill's symptoms. (Tr. 66.)

The vocational expert ("VE") who testified at the hearing classified Ms. Stanfill's past work as sedentary with a skill level of five. (Tr. 33.)[3] Based on a Physical Residual Functional Capacity Assessment completed by a medical consultant, Jeanine Kwun, M.D., the ALJ asked the VE to opine whether an individual who is limited to only four hours of standing and walking and occasional postural changes could perform Ms. Stanfill's past work. (Tr. 78, 545-552.) The VE stated that such an individual would be able to perform Ms. Stanfill's customer service job. (Tr. 78.)

**C. ALJ's Findings**

The ALJ issued his decision denying benefits on October 23, 2012. (Tr. 15.) He made the following findings:

1. Ms. Stanfill met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 17.)

---

[3] The VE testified that the Dictionary of Occupational Titles uses the title "customer service rep" to describe Ms. Stanfill's previous work as a health safety administrator. (Tr. 38.) The VE also classified Ms. Stanfill's other past jobs but, since her other positions had higher exertional levels than her most recent employment as a health safety administrator, the latter classification is the only one that is pertinent here.

4

2. Ms. Stanfill has not engaged in substantial gainful activity since January 13, 2009, the alleged onset date. (*Id.*)

3. Ms. Stanfill has the following severe impairments: severe cardiac arrhythmia disorder treated by pacemaker implant; essential hypertension; and status post myocardial infarction. (*Id.*)

4. Ms. Stanfill does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1. (Tr. 19.)

5. Ms. Stanfill has the residual functional capacity ("RFC") to perform a limited range of light work. (*Id.*) "She can lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 4 of 8 hours, and sit 6 of 8 hours. All postural activities are limited to occasional, with no manipulative or communicative limits. She should avoid hazardous work settings." (*Id.*)

6. Ms. Stanfill is capable of performing her past relevant work as a customer service representative. (Tr. 22.)

7. Ms. Stanfill has not been under a disability from January 13, 2009 through the date of his decision. (*Id.*)

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Importantly, "the mere existence of some factual dispute will not defeat a motion for summary judgment; Rule 56

requires that the fact dispute be genuine and material." *Willis v. Roche Biomed. Lab.*, 61 F.3d 313, 315 (5th Cir. 1995). Material facts are those whose resolution "might affect the outcome of the suit under the governing law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). A court may consider any evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, hearsay, unsubstantiated assertions, and unsupported speculation will not suffice to create or negate a genuine issue of fact. *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shafer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986); *see* Fed. R. Civ. P. 56(c)(4).

### B. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). If the Commissioner's decision satisfies both of these requirements, it must be affirmed. *Id.*

Substantial evidence is defined as "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.* District courts may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute their judgment for that of the Commissioner, even if the evidence preponderates against the

Commissioner's decision. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Id.* The aim is judicial review that is deferential without being so obsequious as to be meaningless. *Id.*

Nevertheless, this standard of review is not a rubber stamp for the Commissioner's decision and involves more than a search for evidence supporting the Commissioner's findings. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (internal citation omitted). The substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision. *Singletary v. Brown*, 798 F.2d 818, 823 (5th Cir. 1986). Rather, the Court must consider the record as a whole and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Id.*

### C. Disability Determination

To be entitled to social security benefits, a claimant must demonstrate that she is disabled as defined by the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563-4 (5th Cir. 1995). A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Brown*, 192 F.3d at 497. The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled:

(1) Whether the claimant is presently engaged in substantial gainful activity;

(2) Whether the claimant has a severe impairment;

(3) Whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations;

>  (4) Whether the impairment prevents the claimant from performing past relevant work; and
>
>  (5) Whether the impairment prevents the claimant from performing any other substantial gainful activity.

*Brown*, 192 F.3d at 498. The claimant bears the burden of proof on the first four steps of the inquiry, but the burden shifts to the Commissioner at the fifth step. *Id.* A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

The existence of a disabling impairment must be demonstrated by medically acceptable clinical and laboratory diagnostic findings. 42 U.S.C. § 423(d)(3). A claimant is eligible for disability insurance benefits only if the onset of the qualifying impairment began on or before the date the claimant was last insured. POMS § 25501.320.

### III.   ANALYSIS

Ms. Stanfill raises the following issues in her cross-motion for summary judgment:

1. The ALJ failed to obtain an assessment from Ms. Stanfill's treating physician.
2. The ALJ failed to send an interrogatory to the ME and instead relied on the ME's interpretation of an incomplete record.
3. Ms. Stanfill presented sufficient evidence to be found disabled under Listing 4.05.
4. The ALJ did not give controlling weight to the opinion of Ms. Stanfill's treating physicians.
5. The ALJ incorrectly applied the severity standard to evaluate evidence of Ms. Stanfill's mental impairment.
6. The ALJ should have assessed Ms. Stanfill's RFC as less than sedentary.

7. The ALJ failed to consider the impact of the side effects of Ms. Stanfill's medications on her functional capacity.

8. The ALJ failed to account for the fact that Ms. Stanfill's symptoms wax and wane intermittently.

### A. Assessment from Treating Physician

Ms. Stanfill argues that the ALJ erred by failing to obtain assessments from her treating physicians. She notes that the ALJ repeatedly emphasized the need for opinions from these physicians, but "rather than requesting the medical information himself, the ALJ placed the onus on [Ms. Stanfill's] attorney to attempt to obtain assessments" from them. (Doc. No. 13 at 4.) Accordingly, she believes the ALJ failed to fulfill his duty to develop the record.

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 94 F.3d 726, 727 (5th Cir. 1996) (per curiam). When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. SSR 96-7p. Notably, an ALJ's failure to adequately develop the record warrants reversal only if the claimant can demonstrate that she was prejudiced by this failure. *Brock*, 84 F.3d at 727. To establish prejudice, a claimant must show that, "had the ALJ adequately performed his duty, he could and would have adduced evidence that might have altered the result." *Reynaud v. Astrue*, 226 F. App'x 401, 402 (5th Cir. 2007) (per curiam).

The Court cannot reverse the ALJ's decision for failure to develop the record because Ms. Stanfill has not demonstrated that she was prejudiced. Ms. Stanfill does not identify any information in her treating physician's records that might have altered ALJ's decision. Despite

9

the ALJ's repeated encouragement, Ms. Stanfill did not take advantage of the opportunity to supplement the record with assessments from her treating physician, Dr. Joshi, or her prior physicians, Drs. Malik and Karim. Instead, she merely points to evidence that reiterates the ME's findings. For example, she argues that there are repeated instances of "abnormal electrocardiogram, echocardiogram, and angiogram studies." (Doc. No. 13 at 8.) Yet, many of these purportedly "abnormal" studies reveal normal sinus rhythm. (*See e.g.*, Tr. 356, 383, 404, 484, 600, 644, 768, 839, 841, 1153, 1174; *see also* Tr. 282 ("EKG: Rate: 79. Paced rhythm with normal capture present. No acute ischemia."), 697 ("auscultation of heart, overall: regular rate, normal heart sounds, no murmurs, rate: regular rate, rhythm: regular rhythm"), 702 ("we have no evidence of arrhythmia"), 742 ("auscultation of heart, overall: regular rate, normal heart sounds and no murmurs"), 844 ("auscultation of heart, overall: regular rate, normal heart sounds, no murmurs, rate: regular rate, rhythm: regular rhythm"), 869 ("syncope with findings of unremarkable echocardiogram"), 930 ("rhythm and rate: regular rate, regular rhythm"), 934 (*Id.*), 1004 ("Cardiovascular: Normal rate, regular rhythm and normal heart sounds"), 1012 (*Id.*).) Moreover, the records created by the heart monitor Ms. Stanfill wore indicate normal sinus rhythm, even though her contemporaneously reported symptoms included chest pain, shortness of breath, and dizziness. (*See e.g.*, Tr. 874, 877, 879, 882, 885, 888, 890, 893, 896.) Although the records occasionally reveal that Ms. Stanfill experienced premature ventricular contractions, the ME indicated that evidence of such contractions alone was insufficient to meet or equal a listing. (Tr. 64.) Thus, additional evidence of premature ventricular contractions would not have altered the result.

This Court has no reason to doubt the veracity of Ms. Stanfill's symptoms. But, subjective symptoms may not be the sole basis for disability. Ms. Stanfill has failed to

demonstrate that, had the ALJ adequately performed his duty to develop the record, his finding may have changed. It seems clear that the record contains enough evidence to support the ALJ's conclusion. Thus, his decision should not be reversed on these grounds.

### B. Incomplete Medical Evidence

Relatedly, Ms. Stanfill also argues that the ALJ should have sent a medical interrogatory to the ME in order to determine if the ME's assessment of Ms. Stanfill's disability changed upon review of the additional medical records. Instead, Ms. Stanfill contends, the ALJ erred by relying on the ME's accounting on an incomplete record.

As outlined above, this Court will not reverse the decision of an ALJ for failure to fully and fairly develop the record, unless the claimant shows that she was prejudiced by the ALJ's failure. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). Again, Ms. Stanfill's argument falters because she has failed to demonstrate that she was prejudiced. Ms. Stanfill does not point to any objective medical evidence in the overlooked records which might have altered the result. In fact, the bulk of the objective medical evidence appears to align with the ME's assessment that Ms. Stanfill's reported symptoms are unsupported by diagnostic testing. Ms. Stanfill's heavy reliance on her subjective complaints of syncope or near-syncope is misplaced – her reported symptoms cannot supplant the need for objective evidence. While this Court hesitates to condone a decision based upon an incomplete review of the available records, it finds no reason to believe that a complete review may have changed the outcome.

### C. Listed Impairment

Listing 4.05 states, in relevant part,

> "*Recurrent Arrhythmias* . . . resulting in uncontrolled, recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope."

11

20 C.F.R. Part 404, Subpt. P, Appendix 1, § 4.05. For a claimant to show that her impairment matches a listing, it must meet *all* of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Similarly, for a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Id.* at 531 (emphasis in original). Thus, in order for Ms. Stanfill to show that she meets or equals Listing 4.05, she must demonstrate that she has episodes of syncope or near syncope that are *documented by medically acceptable testing*.

The ME testified that Ms. Stanfill did not meet or equal Listing 4.05 because the record lacked documented evidence of the occurrence of syncope or near syncope due to recurrent arrhythmias. (Tr. 65.) As discussed in more detail above, Ms. Stanfill has failed to point to any objective medical evidence in the record that refutes this testimony. Thus, the ALJ's conclusion that Ms. Stanfill's impairments "are not attended by the clinical and laboratory findings which are the same as or equivalent to the medical criteria" specified in Listing 4.05 is supported by substantial evidence.

### D. Controlling Weight to the Opinion of Treating Physicians

Ms. Stanfill also argues that the ALJ's finding as to her RFC is "not supported by substantial evidence since treating physicians opined otherwise, and their opinions are supported by substantial record evidence." (Doc. No. 15 at 4.) Unfortunately, Ms. Stanfill does not identify a single instance in the record where her treating physicians assessed her ability to lift, carry, sit, stand or perform postural activities. The Court acknowledges that Ms. Stanfill's treating physicians may in fact disagree with the ALJ's assessment of her functional capacity but,

without evidence of their opinions, the Court is unable to reverse the ALJ's decision on these grounds.

### E. Evaluation of Ms. Stanfill's Mental Impairment

Ms. Stanfill also contends that she has mental impairments that should have been classified as severe in step two of the ALJ's inquiry, and that her mental functional limitations should have been included in the assessment of her RFC. Notably, this appeal is the first time Ms. Stanfill has raised her mental impairments as a basis for limiting her functional capacities. When Ms. Stanfill listed the conditions that limit her ability to work on her disability report, she did not include any mental impairments. (Tr. 183.) At the hearing, the ALJ confirmed with Ms. Stanfill's then-counsel that "this [was] a purely physical case." (Tr. 34.) Ms. Stanfill's counsel said that it was. (*Id.*) The Fifth Circuit has made clear that an ALJ's duty to investigate does not extend to possible disabilities that are not alleged by the claimant or clearly indicated on the record. *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995). Because Ms. Stanfill never previously argued that she had a mental impairment, it cannot be said that she put this impairment before the ALJ. *Id.*

Furthermore, Ms. Stanfill cannot rely on the record for evidence of her mental impairment. Although the record contains references to borderline personality disorder, depression, and anxiety, there is no clear indication that these conditions would significantly limit Ms. Stanfill's ability to do basic work activities. *Cf.* 20 C.F.R. §§ 404.1520(c); 416.920(c) (defining a severe impairment). The mere fact that Ms. Stanfill appears to have been treated for one or more mental impairments (with a prescription for Xanax, for example) is insufficient to trigger the ALJ's duty to investigate. *Cf. Ridley v. Astrue*, No. H-08-3486, 2010 WL 9462578, *3 (S.D. Tex. Nov. 30, 2010) ("Courts have consistently held that isolated references to depression

and anti-depressant drug prescriptions in a claimant's medical records do not require an ALJ to conduct a [psychiatric review technique form] analysis—especially where, as here, there is no initial complaint of mental impairment in the claimant's original request for benefits."). Similarly, Ms. Stanfill's subjective complaints or physicians' opinions that she *may* have Munchausen Syndrome are insufficient to raise a colorable claim of mental impairment. While Ms. Stanfill's mental impairments may in fact materially limit her functional capacities, these limitations are not clearly indicated on the available record. In the absence of such evidence, the ALJ had no way to divine that Ms. Stanfill had a severe mental impairment. Accordingly, there is no basis for reversal.

### F. Residual Functional Capacity

Additionally, Ms. Stanfill argues that the ALJ's assessment of her RFC did not fully encapsulate her limitations. She states that, in direct contradiction to the ALJ's assessment, she "has reported that she is not able to lift more than 10 pounds and has difficulty standing for long periods, walking more than 50 to 100 feet, climbing stairs, squatting, and kneeling due to the exertion on her heart." (Doc. No. 13 at 8-9.) She further states that she experiences fatigue, weakness, shortness of breath, syncope or dizziness, chest pain, and abnormal heart rate. (Doc. No. 13 at 9.)

Unfortunately, while Ms. Stanfill may experience these symptoms, an assessment of her RFC must be based on all of the relevant evidence in the record, not just on her subjective symptoms. SSR 96-8p. In assessing RFC, the ALJ may consider only those limitations and restrictions attributable to medically determinable impairments. *Id.* No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings

demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms. SSR 96-7p. In assessing Ms. Stanfill's RFC, the ALJ determined that her medically determinable impairments "cannot reasonably be expected to produce the symptoms to the degree alleged by the claimant." (Tr. 21.) Ms. Stanfill has not pointed to any objective medical evidence that undermines this determination. Thus, this Court lacks the authority to reverse the RFC assessment on the basis of her symptoms alone.

### G. Side Effects

Ms. Stanfill also believes the ALJ's RFC finding was problematic because it did not mention the side effects caused by her medication. She states that her medication causes "sleepiness, dizziness, chest pain, low electrolytes, intestinal and stomach problems, swelling, and headaches." (Doc. No. 13 at 9, Tr. 224.)

An ALJ must consider side effects in the disability decision process. *See* SSR 96–7p; SSR 96–8p. For instance, side effects are considered in determining a claimant's RFC. *See* SSR 96–8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as: . . . restrictions imposed by the mechanics of treatment) (e.g., . . . side effects of medication [.]"). The failure to consider the side effects of a claimant's medication may constitute error. *Cagle v. Colvin*, No. H-12-296, 2013 WL 2105473, *8 (S.D. Tex. May 14, 2013) (citing *Loza v. Apfel*, 219 F.3d 378, 397 (5th Cir. 2000) ("The history of Mr. Loza's extensive medical treatment with antipsychotic and other mood altering medications not only indicates the presence of a disabling mental illness but also the possibility of medication side effects that could render a claimant disabled or at least contribute to a disability.").

However, the record in this case significantly undermines Ms. Stanfill's contention that the ALJ erred by failing to discuss the side effects of her medication. First, although the record is

replete with reported symptoms which Ms. Stanfill *believes* are side effects of her medication, the Court has found only one instance in which an examining physician may have found that Ms. Stanfill's symptoms are due to her medication; in November 2011, a review of her systems was "[p]ositive for headache secondary to the nitroglycerin." (Tr. 751.) It is unclear from this notation whether the physician was making an independent assessment of the source of Ms. Stanfill's headache or transcribing Ms. Stanfill's recitation. The Court reiterates that, while it takes no position on the authenticity of Ms. Stanfill's symptoms, it cannot reverse the ALJ's decision for failure to consider side effects when those side effects are not substantiated by objective medical evidence. *See Cagle*, 2013 WL 2105473, at *8 ("Aside from the self-described nature of the side effects, which descriptions were themselves inconsistent, there is no objective evidence in the record that Cagle experienced any side effects that limited her ability to engage in basic work activities."). Second, Ms. Stanfill did not raise the issue of side effects at the hearing. *Cf. Cornett v. Astrue*, 261 F. App'x 644, 648 (5th Cir. 2008) (noting as persuasive that the claimant did not testify that he suffered from side effects). This further suggests that any side effects of her medication do not significantly limit her ability to work. Third, Ms. Stanfill has failed to demonstrate that any failure to consider her side effects was not harmless. *See Cagle*, 2013 WL 2105473, at *8 ("Where Cagle's argument for summary judgment fails is in her failure to address harmless error."). Thus, the ALJ's decision cannot be reversed.

### H. Intermittent Symptoms

Finally, Ms. Stanfill argues that the ALJ failed to consider that her cardiovascular symptoms wax and wane intermittently with disabling symptoms. Ms. Stanfill notes that she testified that "she cannot work at any job because she must frequently go to the hospital when she is 'having episodes'." (Doc. No. 13 at 11.) She further stated that "she has a few 'good' days

a month but at least 20-25 bad days each month also." (*Id.*) Based on this testimony, Ms. Stanfill believes that "the ALJ was required to determine whether [she] would be able to maintain employment with such an impairment." (*Id.*)

The Fifth Circuit has said that when, by its nature, a claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms, the ALJ must make a specific finding regarding the claimant's ability to maintain employment. *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). The claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time. *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). The *Frank* court gave an example of evidence that might necessitate a separate finding of a claimant's ability to maintain employment: "if [Ms.] Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination." *Id.* Without such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination. *Perez*, 415 F.3d at 465.

The *Perez* court found that the claimant in that case had not made the requisite showing. Like Ms. Stanfill, Mr. Perez testified that he had good days and bad days. The *Perez* court determined that this testimony "simply does not rise to the level of impairment" necessary. *Id.* Apart from her subjective report of symptoms, Ms. Stanfill has not offered any evidence that her condition "waxes and wanes in such intensity" that her ability to maintain employment was not adequately taken into account in her RFC determination. *See id.* Thus, her argument does not rise to the level of impairment necessary for a separate finding. Accordingly, this argument must be rejected.

## IV. CONCLUSION

For the aforementioned reasons, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED**. The decision of the Commissioner is **AFFIRMED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 18th day of May, 2015.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE